KSC/11.21.24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

TRAVIS SENTELL HOWELL

Defendant.

CRIMINAL No. 1:24-mj-02876

**Filed Under Seal**

☑ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

12:42 pm, Nov 25 2024
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____TTD_____ Deputy

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Special Agent Kyle Yetter, of the Federal Bureau of Investigation ("FBI"), being duly sworn, herby depose and state as follows:

**INTRODUCTION**

1. This affidavit is submitted in support of a criminal complaint charging Travis Sentell **HOWELL** with conspiracy to distribute and to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846.

2. Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that **HOWELL** has violated 21 U.S.C. § 846.

3. Because I have submitted this affidavit for the limited purpose of establishing probable cause for the issuance of an arrest warrant, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

## TRAINING AND EXPERIENCE

4. I am a "Federal Law Enforcement Officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing criminal laws and duly authorized by the Attorney General to request a search warrant. I am also an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. Specifically, I am a sworn member of the Federal Bureau of Investigation (FBI) and have been so employed since July 2022.

5. I am currently a Special Agent assigned to the Baltimore Field Office. As an FBI Special Agent assigned to the Baltimore Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force, I am tasked with investigating violent criminal and transnational criminal organizations engaged in violations of federal firearms laws, controlled substances laws, and violent crime in and around the Baltimore metropolitan area. Prior to my employment as a Special Agent, I began my career I was a sworn Law Enforcement Officer with the United States Capitol Police in Washington, D.C. for approximately five years. Between both U.S. Capitol Police and the FBI, I have completed over 800 hours of specialized criminal investigation training and uniformed police training, including full participation and graduation from the Basic Field Training Course at the FBI Academy in Quantico, Virginia and the Uniformed Police Training Program at the Federal Law Enforcement Training Center located in Glynco, Georgia.

6. I have been the affiant and/or participated in multiple search and seizure warrants for controlled dangerous substances ("CDS"), resulting in the seizure of various types and quantities of CDS. I have participated in multiple controlled purchases of narcotics, and I am

familiar with the utilization of consensual monitoring during these purchases. I have conducted covert surveillance of suspected CDS traffickers, and I have had active involvement and experiences associated with Title III wiretap investigations.

7. Based on my own training, knowledge, and experience, as well as participation in law enforcement matters with other uniformed law enforcement agencies, and based on the training and experience of other Special Agents and Task Force Officers with whom I have worked closely with during CDS related investigations, I believe the following:

   a. That it is common for individuals who deal in illegal controlled substances commonly utilize vehicles to pick up and deliver drugs; to meet with drug customers, sources, and co-conspirators; and to transport drugs and drug proceeds to stash locations.

   b. That drug traffickers utilize counter surveillance when driving to detect law enforcement presence and avoid being followed and that drug traffickers often utilize several locations to store narcotics and narcotics proceeds. In my experience, the use of GPS tracking equipment has enabled law enforcement to identify coconspirators and locate areas used to store narcotics and narcotics proceeds, that otherwise might not have been discovered.

   c. That drug traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. I also know that drug traffickers frequently have access to several cellular telephones and that they periodically use newly acquired cellular telephones, all to avoid detection and to thwart law enforcement efforts. I also know that drug traffickers communicate by use of text messaging to further their illegal activities, and often discuss types, quantities, prices of narcotics and other contraband, as well as to discuss meeting locations, all to avoid detection and to thwart law enforcement.

   d. That the location of these telephones can provide information about the holder's narcotics trafficking, showing the places the holder travels to, including the locations of sources of narcotics supply, stash houses, and the location of other associates.

   e. That drug traffickers often place communication devices, vehicles, and other assets in names other than their own to avoid detection of these items by law enforcement officials.

3

  f. That even though these items are in another entity or person's name, the drug dealers own and continue to use these devices and assets and continue to exercise dominion and control over them.

## PROBABLE CAUSE

**A. Background.**

8. In October 2022, the DEA and the FBI entered into a joint investigation targeting the Travis **HOWELL** drug trafficking organization ("DTO").  **HOWELL** has a prior federal conviction for a drug offense.  Specifically, on January 6, 2012, **HOWELL** was arrested by the DEA in Baltimore, Maryland for possession with intent to distribute heroin.  In November 2014, **HOWELL** pleaded guilty in the United States District Court for the District of Maryland to conspiracy to distribute heroin.  Subsequently, the Court sentenced **HOWELL** to a 50-month term of incarceration and a 60-month term of supervised release.

9. **HOWELL** also has the following convictions: (1) a 1996 conviction for robbery, for which he was sentenced to 5 years of imprisonment (with four and a half years suspended) and 3 years of probation; (2) a 1999 conviction for conspiracy related to CDS offenses, for which he was sentenced to 8 years of imprisonment (with 7 years and 8 months suspended) and 3 years' probation; (3) a 1999 conviction for illegal possession of a firearm and for importation of cocaine, for which he was sentenced to 2 years of imprisonment; and (4) a 2001 conviction of violation of probation, for which he was sentenced to 3 years and 7 months of imprisonment.

10. Based on information obtained from Confidential Human Sources ("CHS"), along with surveillance, controlled narcotic purchases, the execution of search warrants, the interception of wire communications, and other investigative means, investigators were able to identify multiple individuals associated with the **HOWELL** DTO.

11. Among other people, investigators identified **Co-Conspirator 1** as an individual involved with suspected drug transactions associated with the **HOWELL** DTO.  **Co-Conspirator**

**1** has a prior federal conviction for conspiracy to distribute and to possess the intent to distribute cocaine base and heroin. Based on information received from **Co-Conspirator 1**'s Probation Officer, investigators identified an address associated with **Co-Conspirator 1** in Baltimore, Maryland ("**Co-Conspirator 1's First Address**"). In July 2023, investigators utilized covert video surveillance and conducted a trash-pull on a black garbage bag, believed to have been in possession of **Co-Conspirator 1** and discarded by him in a dumpster near **Co-Conspirator 1's First Address**. The black garbage bag contained multiple clear plastic bags containing residue, mannite bar wrappers, small Ziploc bags marked with an apple logo, as well as black latex gloves. The following day, a field drug test was conducted pertaining to the clear plastic bags containing residue. The bags tested positive for trace amounts of fentanyl. Investigators have observed **Co-Conspirator 1** conduct suspected drug transactions with **HOWELL**.

12. Investigators also identified a second location associated with **Co-Conspirator 1** as the suspected address in which **Co-Conspirator 1** primarily resides ("**Co-Conspirator 1's Second Address**"). A query of Maryland State Department of Assessments and Taxation revealed that **Co-Conspirator 1** is the listed owner of **Co-Conspirator 1's Second Address**.

13. Investigators have also identified **Co-Conspirator 2** as an individual involved with money laundering for the DTO. Investigators believe that **Co-Conspirator 2** launders money for the DTO through Maryland Live Casino. Specifically, **Co-Conspirator 2** has no listed wages since 2021. In 2021, investigators identified that **Co-Conspirator 2** was employed and had estimated wages of approximately $2,026.27 for the fourth quarter of the year. According to casino records, between January of 2019 and November of 2022, **Co-Conspirator 2** spent over approximately 700 days at the Maryland Live Casino and has inserted an estimated $4,260,396.00 of U.S. Currency into the casino slot machines.

B.   **Surveillance of HOWELL and Co-Conspirator 2.**

14.   During this investigation, investigators submitted legal process to Maryland Live Casino pertaining to **Co-Conspirator 2**'s activity on November 9, 2023. Maryland Live Casino subpoena records include "transaction logs", which are detailed casino gaming records linked to a player name through use of a casino "loyalty card." The loyalty card number is a unique number and **Co-Conspirator 2** is assigned a certain player number. The casino transaction log shows that on November 9, 2023, beginning at approximately 6:06pm, **Co-Conspirator 2** inserted $20,250 cash into slot machines at Maryland Live Casino.

15.   I am aware that casinos are commonly used to launder criminal proceeds. The criminal's objective is to make their funds appear to come from a legitimate source. In this case, **Co-Conspirator 2** used a money laundering strategy called "bill stuffing." Bill stuffing occurs when a subject puts physical cash proceeds into a slot machine, conducts some or no actual gaming activity, and then cashes out with a printed ticket. The printed ticket may be inserted into another slot machine or cashed-out at a cashier or redemption cage. The money now appears to be gambling winnings and the criminal nature of the original proceeds is more difficult to track.

16.   Subsequent to the bill stuffing activity and continuing until approximately 6:00 a.m. on November 10, 2023, **Co-Conspirator 2** conducted a number of slot machine "cash out" transactions totaling $16,631.80. The cash out transactions were Ticket-in, Ticket-out ("TITO") tickets generated by the slot machines. TITO tickets may be used for further gaming or redeemed for cash at a cashier cage or ticket redemption unit. TITO tickets do not have to be redeemed on the date they are issued. Investigators are aware of a number of examples where **Co-Conspirator 2** redeemed TITO tickets for cash several days after the gaming activity occurred. In addition to

6

the above example, there are other historical activities observed by Maryland Live Casino concerning **Co-Conspirator 2** in which he appeared to conceal financial reporting requirements.[1]

17. Investigators identified an address of 2106 Koko Lane, Baltimore, Maryland 21216 (The "**Koko Residence**"), as a family address frequented by **HOWELL** and owned by Maurice Smith. Surveillance revealed that **HOWELL** and other members of the DTO were using the **Koko Residence** for suspected narcotics transactions. Additionally, **HOWELL** also lists the **Koko Residence** as the business address for businesses with which he was associated. In November 2022, investigators began conducting surveillance of 2106 Koko Lane, Baltimore, Maryland using a covert video surveillance camera.

18. Investigators monitored covert video surveillance pertaining to the area of the **Koko Residence** on a date at the end of November 2023. At approximately 1:29 p.m., **HOWELL's** Acura MDX, along with vehicle of another suspected co-conspirator, were observed parked across the street from the **Koko Residence**. At approximately 1:34 p.m., **Co-Conspirator 2** was observed driving south bound on Koko Lane and parked across the street from **HOWELL**. **HOWELL** exited the driver's side door of his vehicle and entered the front passenger compartment of **Co-Conspirator 2**'s vehicle. Investigators reviewed court-authorized GPS tracking data associated with **Co-Conspirator 2**'s vehicle and confirmed that the vehicle was

---

[1] On October 24, 2022, **Co-Conspirator 2** was gaming at a slot machine and won a jackpot for $6,010. Large slot machine jackpots are generally verified and paid out by casino slot attendants. Additionally, jackpots over $1,200 require a Form W2-G to be filed to report the corresponding gambling winnings to the IRS. After winning the jackpot, but prior to the arrival of the slot attendant, **Co-Conspirator 2** switched seats with another gambler. When the slot attendant arrived minutes later, the attendant took the other gambler's information and paid the $6,010 to that person. After the attendant departed the area, that person handed the cash to **Co-Conspirator 2,** and they switched seats again. This gives the appearance that **Co-Conspirator 2** was attempting to evade the Form W2-G reporting requirements and furthers the belief that **Co-Conspirator 2**'s gambling activity is intended to obfuscate the nature, source, and flow of the DTO proceeds and further thwart law enforcement's ability to follow the money.

stopped on Koko Lane at approximately 1:36 p.m. Additionally, toll analysis associated with **HOWELL's** telephone number identified telephonic communication with a telephone number used by **Co-Conspirator 2** at approximately 1:02 p.m.

19. Once **HOWELL** entered **Co-Conspirator 2**'s vehicle, **HOWELL** was observed counting out a large stack of U.S Currency, and then giving it to **Co-Conspirator 2**. **HOWELL** then repeated this process, giving **Co-Conspirator 2** a second large stack of U.S. Currency. While **HOWELL** was counting the stacks of U.S. currency, **Co-Conspirator 2** was observed looking the opposite direction, and out the windows, not looking at **HOWELL**. **HOWELL** then placed the remaining U.S. Currency he did not provide to **Co-Conspirator 2** in his pocket and exited the vehicle.

20. I know based on my training, knowledge, and experience that the trafficking of CDS is largely cash based. Individuals involved in the sale of CDS obtain large amounts of cash. Those individuals must then attempt to produce legitimate means of acquiring the U.S. currency. The above-described "bill-stuffing" activities by **Co-Conspirator 2** at Maryland Live Casino are indicative of an attempt to legitimize the cash as money won from the casino. Additionally, the above-described meeting between **HOWELL** and **Co-Conspirator 2**, where **HOWELL** gave **Co-Conspirator 2** two large stacks of U.S. currency, is not consistent with ordinary transfers of currency for legitimate reasons. Additionally, **Co-Conspirator 2** looking out the window and not at **HOWELL** indicates that he was looking to be able to warn **HOWELL** of the presence of law enforcement or someone who may attempt to rob them of the U.S. currency.

C. **Interception of Wire Communications Over Cell Phones used by Travis HOWELL and Associated Surveillance.**

21. On March 5, 2024, the Honorable Brendan A. Hurson, United States District Judge for the District of Maryland, authorized the initial interception of wire communications over

8

**HOWELL's** cellular telephone with telephone number (410) 772-4475 and **HOWELL's** cellular telephone with telephone number (443) 790-5875. Interceptions of wire communications began on March 5, 2024. On April 3, 2024, the Honorable Brendan A. Hurson, authorized the continued interception of wire communication **HOWELL's** telephone number (410) 772-4475. Investigators did not seek to renew authorization on (443) 790-5875. On May 2, 2024, the Honorable Brendan A. Hurson authorized the continued interception of wire communication over **HOWELL's** telephone number (410) 772-4475. Interceptions concluded on June 1, 2024.

22.     On March 31, 2024, at approximately 1:45 p.m., **HOWELL** using telephone number (410) 772-4475 placed an outgoing call to **Co-Conspirator 2**. During the conversation **HOWELL** stated, "Yo make sure you got your phone on" and "alright, charge it or something". Investigators believe based on their training, knowledge, and experience that **HOWELL** was telling **Co-Conspirator 2** to keep his phone charged because **HOWELL** would be contacting him at some point in the near further about something that was important, and **HOWELL** did not want **Co-Conspirator 2's** phone to be off.

23.     Later that day, on March 31, 2024, at approximately 9:59 p.m., a telephone call was intercepted, with an unknown direction, between **HOWELL's** telephone number (410) 772-4475 and an unknown telephone number.[2] Based on previous calls, the caller's voice, and context of the call, investigators believe that **Co-Conspirator 2** was the other participant in the intercepted communication. During this conversation, **HOWELL** directed **Co-Conspirator 2** by saying "get uh the MDX because something about it [unintelligible] get the MDX." **HOWELL** also stated,

---

[2] During this wiretap investigation, there have been intercepted communications where the direction of the call (i.e., incoming/outgoing) is "unknown" and the telephone number is "unknown." Investigators have seen this occur where the telephone number was already in use and another call was placed to the same telephone number and answered. This has occurred several times.

9

"Nah, just grab your MDX." **HOWELL** also told **Co-Conspirator 2**, "I gonna send you the address for the meeting. [unintelligible] with you?" Investigators believe, based on their training, knowledge, and experience, that **HOWELL** was directing **Co-Conspirator 2** to change his vehicle for a different vehicle. Investigators believe **HOWELL** directed **Co-Conspirator 2** to take a different vehicle to avoid detection, by both law enforcement and other rival CDS distributers. Furthermore, **HOWELL** stated he was going to send **Co-Conspirator 2** "the address for the meeting." Investigators believe that **HOWELL** was referring to a CDS "meeting" and that he utilized vague language to avoid openly discussing an anticipated CDS transaction on a non-encrypted platform.

24. After these intercepted conversations, there were multiple intercepted conversations between **HOWELL**'s telephone number and two other individuals. During these conversations, **HOWELL** directed both individuals to a specific Holiday Inn location at 7900 Washington Boulevard, Jessup MD. 20794. Investigators later reviewed court-authorized GPS location data associated with **HOWELL's** telephone number (410) 772-4475 and identified that during the above-described intercepted communication, **HOWELL's** telephone was located in the approximate area of the Holiday Inn (Columbia East Jessup) parking lot, located at 7900 Washington Boulevard, Jessup, MD 20794. Then, from approximately 11:45 p.m. on March 31, 2024, to 12:15 a.m. on April 1, 2024, **HOWELL's** telephone was located in the area of Washington Boulevard and Fort Meade Road in Laurel, MD, which is approximately five miles south from the Holiday Inn on Washington Boulevard. **HOWELL's** telephone then returned to the area of the Holiday Inn until approximately 11:00 a.m. on April 1, 2024.

25. On April 2, 2024, investigators submitted an administrative subpoena to the Holiday Inn located at 7900 Washington Boulevard, Jessup, MD 20794, requesting reservation

information for individuals who checked in between March 31, 2024, at 8 p.m., and April 1, 2024, 1:00 a.m. Investigators identified that **HOWELL** had booked room 226 and checked in at 12:24 a.m. on April 1, 2024, and that **Co-Conspirator 2** had booked room 340 and checked in at 12:52 a.m. on the same day.

26. Investigators also reviewed security footage from the front desk area of the hotel and observed **HOWELL** approach the check in counter at approximately 12:24 a.m. on April 1, 2024. Investigators also observed that **HOWELL** was with a female associate. After checking in, **HOWELL** exited the building and returned carrying a large backpack. Both **HOWELL** and the female associate then proceeded towards the elevators. Additionally, **Co-Conspirator 2** was observed approaching the front desk area at approximately 12:52 a.m. **Co-Conspirator 2** was accompanied by another suspected co-conspirator.

27. Investigators believe, based on their training, knowledge, and experience, that the above-described actions and intercepted calls are consistent with a CDS transaction. For instance, **HOWELL** and **Co-Conspirator 2** reserved two separate hotel rooms in the same hotel, staying there for one night, and then returning where they both live—within approximately 30-60 minutes of the hotel—is inconsistent with normal behavior. Additionally, investigations know that individuals will utilize hotel rooms to distribute CDS to deter individuals and law enforcement from locating long term storage locations for CDS.

28. On May 23, 2024, at approximately 10:20 a.m., **HOWELL** while utilizing telephone number (410) 772-4475 made an outgoing call to **Co-Conspirator 2**. During the intercepted communication, **HOWELL** asked **Co-Conspirator 2,** "You Ready?" Investigators reviewed telephonic toll data pertaining to **Co-Conspirator 1**'s telephone, and identified that approximately 5:13 p.m., **Co-Conspirator 1** received an incoming call from **Co-Conspirator 2**.

29.     Investigators reviewed court authorized GPS data pertaining to a tracker affixed to **Co-Conspirator 2's** vehicle and identified that at approximately 7:53 p.m., **Co-Conspirator 2's** vehicle departed the area of **Co-Conspirator 2's** residence. Investigators monitored the location data for **Co-Conspirator 2's** vehicle and observed it to travel to the area of **Co-Conspirator 1's First Address**. At approximately 8:35 p.m., **Co-Conspirator 2's** vehicle appeared in view of covert video surveillance located in front of the front entrance of **Co-Conspirator 1's First Address**.

30.     Investigators reviewed covert video surveillance pertaining to **Co-Conspirator 1's First Address** and observed at approximately 8:17 p.m., **Co-Conspirator 1** walked from the direction of his apartment and exited **Co-Conspirator 1's First Address**. **Co-Conspirator 1** appeared to sit on the stairs of the building, outside the front door. Shortly thereafter, **Co-Conspirator 2**arrived. **Co-Conspirator 1** then approached the front passenger side window of **Co-Conspirator 2's** vehicle and appeared to talk to **Co-Conspirator 2**. **Co-Conspirator 1** appeared to reach in his pockets with his right hand, then deep inside the vehicle, and later removed what appeared to be a white box from the passenger side window of the vehicle. At approximately 8:57 p.m., **Co-Conspirator 2**'s vehicle drove away and disappeared out of view from video surveillance. Investigators reviewed GPS tracking data associated with **Co-Conspirator 2's** vehicle and identified at approximately 9:46 p.m. the vehicle was in the area of **Co-Conspirator 2's** residence. Investigators believe that **Co-Conspirator 2** drove directly from **Co-Conspirator 1's First Address** back to his residence.

31.     Meanwhile, **Co-Conspirator 1**, now in possession of the white box, walked back to the front entrance of **Co-Conspirator 1's First Address**, entered the lobby, and appeared to walk down towards the location of his apartment. At approximately 9:15 p.m., **Co-Conspirator**

12

**1** reappeared from the direction of the apartment, no longer in possession of the box retrieved from **Co-Conspirator 2's** vehicle. **Co-Conspirator 1** entered the driver's side compartment of his vehicle and drove away disappearing out of view.

32. Investigators believe based on their training, knowledge, and experience that the above-described interaction is consistent with a CDS transaction. For instance, **Co-Conspirator 2** traveled from the area of his residence, only stopping briefly on the way to deliver a box to **Co-Conspirator 1** at **Co-Conspirator 1's First Address**, which is a suspected stash location for the **HOWELL** DTO.

D. **Execution of Multiple Search Warrants Associated with the HOWELL DTO.**

33. On June 3, 2024, the Honorable Erin Aslan, U.S. Magistrate Judge for the District of Maryland, authorized search warrants for multiple locations associated with the **HOWELL DTO**. These locations included **Co-Conspirator 1's First Address, Co-Conspirator 1's Second Address**, and a location associated with **HOWELL**, located at 3215 Mayfair Road, Gwynn Oak, Maryland. On June 4, 2024, investigators executed the above authorized search warrants.

34. At the **Co-Conspirator 1's Second Address**, investigators located five brick shaped objects wrapped in cellophane, labeled "Mobile 1" (pictured below). These objects were found hidden under a bed. They were later field tested and identified to be kilogram quantities of cocaine. **Co-Conspirator 1** was present during the search and was taken into custody.



35.     Investigators noted that on the morning of June 4, 2024, between approximately 1:00 a.m. and 2:00 a.m., a court authorized GPS tracker affixed to **Co-Conspirator 2's** vehicle identified the vehicle to be in the area of **Co-Conspirator 1's Second Address**.

36.     Regarding Co**-Conspirator 1's First Address**, investigators identified paint cans that appeared to have "false bottoms" inside them (pictured below).  Inside the cans contained an unknown white powdery substance.



14

37. This substance was sent for laboratory testing and is pending further analysis. I believe based on training, knowledge, and experience that the unknown white powdery substance contains illegal CDS. I know through training, knowledge, and experience that containers with false bottoms are a tool used by those who distribute illegal drugs in-order to not be detected by law enforcement.

38. During the search warrant execution at the Mayfair location, investigators identified that **HOWELL**, Dominiece **BRADLEY**, and Khalise Williams were present at the address. On top of a mirrored dresser in a bedroom of the residence, investigators observed a wallet containing **HOWELL's** driver's license and a brown substance, which investigators believed to be heroin. Investigators seized the brown substance and submitted it for further testing, which is pending final results. Additionally, investigators located a firearm within the hamper of the same bedroom that contained **HOWELL's** driver's license. **HOWELL** agreed to speak to investigators after the execution of the search warrant.

E. **Post-*Miranda* Interview of Travis HOWELL.**

39. As noted above, **HOWELL** was observed and detained at the Mayfair location. **HOWELL** was later interviewed. Prior to the interview, **HOWELL** was advised the identity of the interviewing agents and the nature of the interview. He was also advised of his as rights under *Miranda* via an FBI "Advise of Rights form." **HOWELL** stated to investigators that he understood his rights and the consent portion. **HOWELL** signed the waiver and then provided investigators with the following information, among other things:

40. **HOWELL** stated that he received multi-kilogram quantities of cocaine from an individual who resided in Phoenix Arizona, known to him by a particular nickname (the "Source of Supply") and that he had been purchasing cocaine from this individual for multiple years.

41.     **HOWELL** stated that he owed the Source of Supply approximately $200,000. During a trip to Los Angeles, California during the prior week, **HOWELL** stated that he transported $180,000 of U.S. Currency, which he provided to a courier in Los Angeles as payment for cocaine received from the Source of Supply.[3] **HOWELL** has made multiple short trips to Los Angeles, which he explained were all to provide payment for cocaine, and all payments were of approximately $100,000 or more. **HOWELL** initially stated that the most cocaine he has received from the Source of Supply was 5 kilograms. However, **HOWELL** then acknowledged that in 2023, he received a shipment of 10 kilograms of cocaine from a courier for the Source of Supply at Security Mall (6901 Security Blvd, Baltimore, MD, 21244). **HOWELL** explained that he commonly received cocaine shipments by couriers coming from Arizona or California. **HOWELL** explained that the couriers operated vehicles with hidden compartments or "traps," car carriers with the cocaine hidden in the towed vehicles, or through large tractor trailer or refrigerator trucks. The vehicle used would vary based on the quantity of cocaine being delivered. **HOWELL** explained that he would get notified by the Source of Supply when the courier was two hours away from Baltimore, and **HOWELL** provided the Source of Supply with a meeting location. **HOWELL** did not speak directly with the courier. **HOWELL** explained that he provided payment for the cocaine by flying to Los Angeles or Phoenix and delivering money to a courier, by shipping the currency, placing the currency in vehicles and shipping the vehicles, or by Western Union transfers for smaller quantities of money.

---

[3] Investigators noted that on May 28, 2024, **HOWELL** booked a flight to Los Angeles Airport (LAX) in California, scheduled for May 30, 2024, with a departure from Baltimore Washington International Airport (BWI) and a return flight scheduled for the following day on May 31, 2024. The itinerary was more specifically: United Airlines flight 743, departure from BWI at 5:45 p.m., with an arrival to LAX at 8:12 p.m. and United Airlines flight 1605, departure from LAX at 11:18 p.m., with an arrival to BWI at 7:28 a.m.

42. **HOWELL** was asked about his recent stay that occurred at the Holiday Inn Hotel in Jessup Maryland, an instance that is described above. **HOWELL** stated **Co-Conspirator 2** had arranged a 15-kilogram shipment of cocaine that they were going to split, but the shipment did not arrive. **HOWELL** told investigators that he was going to take 7 kilograms and **Co-Conspirator 2** was going to take the remaining 8 kilograms. **HOWELL** stated that **Co-Conspirator 2** had a gambling problem and has won over $100,000 gambling. **HOWELL** told investigators that he did not talk to **Co-Conspirator 2** often but knows **Co-Conspirator 2** is involved in trafficking cocaine. **HOWELL** stated that he did not know how **Co-Conspirator 2** received or distributed cocaine. **HOWELL** stated that he has contacted **Co-Conspirator 2** before to get cocaine if he does not have any, and that **Co-Conspirator 2** has done the same with **HOWELL**. **HOWELL** did not wish to provide many details regarding **Co-Conspirator 2**.

43. **HOWELL** was asked about events that occurred on April 14, 2024. **HOWELL** advised investigators that he purchased a kilogram of cocaine through another co-conspirator for resale. On April 14, 2024, **HOWELL** purchased a kilogram of cocaine for $15,000, and then sold it to another male for $16,000.

44. **HOWELL** also advised that **Co-Conspirator 1** was a multi-kilogram narcotics distributor and received illegal CDS from an unknown male at a bar on Washington Boulevard in Lansdowne, MD.

45. **HOWELL** stated in 2024, he has sold approximately 30 kilograms of cocaine to multiple individuals. **HOWELL** explained that he sells cocaine at night, and leaves his phone and vehicle, and instead uses the rideshare Lyft for transportation. **HOWELL** explained that he sold 1/8 of a kilogram of cocaine for $2,000 and 1/4 of a kilogram of cocaine for $4,000. Upon the conclusion of the interview, **HOWELL** was released pending charges.

46. Upon his release, **HOWELL** expressed an interest in cooperating with law enforcement. **HOWELL** maintained contact with investigators, but approximately two weeks later, **HOWELL** traveled via an international flight, leaving the United States from Dulles International Airport to Qatar, with an ending destination believed to be the Philippines. **HOWELL** is believed to have remained outside of the United States from June 15, 2024, to present. On November 19, 2024, investigators were notified that **HOWELL** booked a departure flight from Istanbul, with a final destination of Dulles International Airport on the evening of November 22, 2024.

## CONCLUSION

47. Based on the foregoing, I respectfully submit there is probable cause to believe that Travis Sentell **HOWELL** has participated in a conspiracy to distribute and to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846. Accordingly, I respectfully request that the Court authorize the attached Criminal Complaint for Travis Sentell **HOWELL**.

48. I affirm under penalties of perjury that the facts and circumstances recounted are true and accurate to the best of my knowledge, information, and belief.

_Kyle Yetter_
Special Agent Kyle Yetter
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this __22nd__ day of November 2024.



Honorable Erin Aslan
United States Magistrate Judge